IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

    *Plaintiff*,

        v.

GREYSTAR MANAGEMENT
SERVICES L.P.,

    *Defendant*.

Civil Action No. ELH-11-2789

## MEMORANDUM OPINION

The Equal Employment Opportunity Commission (the "EEOC") filed suit against Greystar Management Services L.P ("Greystar"), a property management firm, to "correct [alleged] unlawful employment practices on the basis of sex, and to provide appropriate relief to Amada Lucero," who worked as a housekeeper at a large apartment complex managed by Greystar.[1]  Complaint (ECF 1) at 1.  Suit is premised on Section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) (the "PDA").  The PDA extended the prohibition against sex discrimination under Title VII to include discrimination "on the basis of pregnancy, childbirth, or related medical conditions."  *Id.*

In its Complaint, the EEOC alleges that Greystar engaged in sex discrimination by terminating Lucero after she became pregnant.  *See* ECF 1 at 1.  In particular, the EEOC

---

[1] When Ms. Lucero began her employment in August 2008, she worked at an apartment complex in Rockville, Maryland, managed by JPI Management.  She became an employee of Greystar on January 1, 2009, when Greystar acquired JPI.  *See* Deposition of Joi Ervin, Oct. 5, 2012, at 9.

contends that Greystar discriminated against Lucero by deferring to her doctor's pregnancy-based medical restrictions, and by refusing to allow Lucero to waive those restrictions. According to the EEOC, Greystar's statements and actions constitute direct evidence that it violated the PDA.[2]

The EEOC seeks compensatory and punitive damages as well as injunctive relief. In particular, on behalf of Lucero, it requests "appropriate backpay with prejudgment interest" as well as "reinstatement." *Id.* at 4 (Prayer for Relief). Additionally, the EEOC seeks compensatory damages for Lucero for "past and future pecuniary losses resulting from the unlawful employment practices," as well as "past and future non-pecuniary losses resulting from the unlawful practices . . . including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses" in amounts to be determined at trial. *Id.* And, the EEOC seeks punitive damages for Lucero. *Id.* at 4-5.

The parties filed cross-motions for summary judgment, which have been fully briefed.[3] No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I will deny both motions.

---

[2] On March 7, 2013, the parties filed a stipulation dismissing with prejudice the claim that Greystar "failed to maintain records in violation of 29 C.F.R. § 1602.14 as set forth in paragraph 13 of the Complaint." *See* ECF 37.

[3] I have reviewed the EEOC's Motion for Partial Summary Judgment (ECF 39, "EEOC Mot."), in which it seeks summary judgment as to liability only, and an accompanying memorandum (ECF 39-1, "EEOC Mem."); Greystar's Memorandum in Support of Defendant's Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment (ECF 40, "Greystar Mot."); the EEOC's Reply in Support of its Motion for Partial Summary Judgment and Opposition to Defendant's Cross Motion for Summary Judgment (ECF 41, "EEOC Reply"); and Greystar's Reply Memorandum in Further Support of Defendant's Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment (ECF 42, "Greystar Reply").

## Background[4]

### A. Lucero's Position at Greystar

In August 2008, Amada Lucero began working as one of two housekeepers for the Huntington at King Farm, a large apartment complex in Rockville, Maryland. Deposition of Amada Lucero, Aug. 23, 2012 ("Lucero Dep.") at 45; Deposition of Joi Ervin, Oct. 5, 2012 ("Ervin Dep.") at 11; Affidavit of Joi Ervin, Apr. 19, 2013 ("Ervin Aff.") ¶ 6; Defendant's Answer to Plaintiff's Interrogatories ("Greystar Interrog. Resp.") at 6.[5] She is from El Salvador, and her command of English is limited. Lucero Dep. at 7-8, 110.

Greystar is a full-service, multi-family property management company headquartered in South Carolina. Greystar Interrog. Resp. at 11. It manages apartment communities across the United States, and assumed management of the Huntington at King Farm when it purchased the

---

The parties submitted numerous exhibits in support of each motion. The EEOC appended 10 exhibits, including excerpts from the deposition of Amada Lucero (Exhibit 1); excerpts from the deposition of Pamela Couch (Exhibit 2); excerpts from the deposition of Joi Ervin (Exhibit 3); Greystar's Answer to Plaintiff's Interrogatories (Exhibit 4); excerpts from the deposition of Matthew Smith (Exhibit 5); excerpts from the deposition of Shawna Solomon (Exhibit 6); excerpts from the deposition of Melanie Aaron (Exhibit 7); excerpts from the deposition of Angel Rodriguez (Exhibit 8); the Declaration of Amada Lucero (Exhibit 9); and excerpts from the deposition of Lori Vickory (Exhibit 10). Additionally, the EEOC attached excerpts from six of these same exhibits as Exhibits 1 through 6 to its Reply. ECF 41.

Greystar attached 31 exhibits, including, *inter alia*, excerpts from the deposition of Joi Ervin (Exhibit 1); excerpts from the deposition of Melanie Aaron (Exhibit 2); excerpts from the deposition of Amada Lucero (Exhibit 3); the Affidavit of Lori Vickory (Exhibit 13); the Affidavit of Joi Ervin (Exhibit 14); excerpts from the deposition of Angel Rodriguez (Exhibit 18); excerpts from the deposition of Shawna Solomon (Exhibit 19); excerpts from the deposition of Matthew Smith (Exhibit 24); and excerpts from the deposition of Heather Hepler (Exhibit 25). Greystar also attached to its Reply excerpts from Lucero's deposition (Exhibit 32). ECF 42.

[4] The facts set forth in this section are undisputed, unless otherwise noted.

[5] Lucero is occasionally referred to as "Yanira." *See, e.g.*, Ervin Dep. at 16-17; Deposition of Matthew Smith, Oct. 11, 2012, Ex.C (D00701).

real estate firm JPI Management ("JPI") on January 1, 2009. *Id.*; Ervin Dep. at 9. Although Lucero was originally hired by JPI, she became an employee of Greystar as a result of the purchase. Deposition of Pamela Couch, Aug. 9, 2012, at 12-13.[6] It is undisputed that after Greystar acquired JPI, Lucero continued in her same role as a housekeeper, working at the same facility and reporting to the same manager and Director of Community Operations ("Community Director."). *See* Greystar Mot. at 5 & n.1.

Lucero's direct supervisor was Angel Rodriguez, the Service Manager. Lucero Dep. at 46; Ervin Dep. at 12; Ervin Aff. ¶ 4. Rodriguez did not have the power, on his own, to terminate Lucero or to place her on a leave of absence. Ervin Dep. at 12. That authority rested with Rodriguez's supervisor, Joi Ervin, the Community Director. Ervin Dep. at 9-13; Ervin Aff. ¶ 4. In at least some instances, Ervin received guidance from others on hiring and firing decisions, including Senior Regional Property Manager Melanie Aaron as well as Greystar's Human Resources department.[7] Deposition of Matthew Smith, Oct. 11, 2012 ("Smith Dep.") at 25-26. In addressing Lucero's situation, Ervin worked with Human Resources Assistant Shawna Solomon, who reported to Human Resources Director Matthew Smith. *Id.* at 26; Deposition of Shawna Solomon, Aug. 9, 2012 ("Solomon Dep.") at 22. Solomon testified that she coordinated closely with Smith regarding Lucero. Solomon Dep. at 26, 38.

As a housekeeper, Lucero's primary duty was cleaning. Deposition of Melanie Aaron, Aug. 7, 2012 ("Aaron Dep.") at 29. According to the written job description that Greystar used

---

[6] For simplicity, in describing Lucero's employment and responsibilities, I refer only to Greystar and not to JPI.

[7] The record contains some indication that Greystar used the term "Talent Management" to refer to its Human Resources department. *See* Aaron Dep. at 22.

nationally for the position of "Housekeeper," the job involved exposure to various substances, including cleaning chemicals for up to 33 percent of the time. *Id*. Ex.A ("Position Description - Housekeeper"). According to Greystar, housekeepers for the Huntington at King Farm spent a majority of their time using cleaning chemicals. Ervin Dep. at 44-45; Ervin Aff. ¶ 9; *see also* Aaron Dep. at 79-80.

When Lucero's employment began, she and one other housekeeper were responsible for cleaning the apartment complex's common areas. Ervin Aff. ¶ 6. Their tasks included cleaning bathrooms, kitchens, playrooms, computer rooms, fitness centers, and offices; vacuuming; mopping; and emptying trash cans. *Id*. Beginning in December 2008, Lucero and the other housekeeper were also required to clean apartments that had been vacated by departing tenants. Aaron Dep. at 43; Ervin Aff. ¶ 7. This change was made for budgetary reasons, to reduce reliance on outside cleaning services that previously had cleaned vacant apartments and prepared them for new tenants. Lucero Dep. at 42-45; Aaron Dep. at 43; Ervin Aff. ¶ 8. By January 2009, each housekeeper was expected to clean 16 apartments per month. *Id*. Cleaning the vacant apartments involved, among other things, cleaning the bathrooms and kitchens, mopping, and removing debris. Ervin Aff. ¶ 8.

In performing their duties, Lucero and the other housekeeper were required to use various cleaning chemicals, such as Comet, Total Odor Control, Goof Off, CLR, ZEP, Glass Cleaner, 409, Johnny's Bowl Cleaner, Shower Power, Clorox, GOJO, Brasso, Graffiti Remover, WD40, Simple Green, Pledge, and Sunlight Gel. Ervin Aff. ¶ 9; Greystar Mot. Ex.15 (D00719) (e-mail

from Ervin to Solomon dated March 24, 2009, listing chemicals used by housekeepers).[8] Greystar expected Lucero to use chemicals for cleaning toilet bowls, sinks, tubs, and showers; cleaning refrigerators, ovens, ranges, and countertops; mopping; and for general cleaning of surfaces in playrooms, fitness centers, offices, and other common areas. Ervin Aff. ¶ 10.

Rodriguez provided the housekeepers with the chemicals they requested. Deposition of Angel Rodriguez, Oct. 5, 2012 ("Rodriguez Dep.") at 15-16. Lucero had some discretion to choose which cleaning products she used, as long as the work was completed. *Id.* at 16, 19, 24. According to Rodriguez, the cleaning products Lucero used most frequently were bleach, Windex, and Simple Green. *Id.* at 13.[9]

On February 3, 2009, Lucero received a verbal warning from Rodriguez, her immediate supervisor, and Ervin, Rodriguez's supervisor and the complex's Community Manager, regarding the quality and quantity of her work. Greystar Mot. Ex.17 (D00610) ("Associate Verbal Warning Report" dated February 2, 2009); Ervin Aff. ¶ 11. The "Associate Verbal Warning Report" stated, among other things, that Lucero failed to meet deadlines for cleaning the Resident Services Clubhouse and Leasing Clubhouse at the complex; that she "ha[d] not been paying enough attention to detail[,] leaving trails of dust on furniture, tabletops, and shelves in both clubhouses"; that she failed to complete four full apartment cleanings each week, as was required beginning in December; and that she had been told to work without the other housekeeper's assistance unless her supervisor grants permission. *Id.*; *see also* Rodriguez Dep. at 22 ("I don't remember the details but I do remember the clubhouse was not getting cleaned

---

[8] Where available, I have cited the Bates numbers appearing on documents in the record.

[9] The EEOC describes Simple Green as "a non-toxic, non-flammable, bio-degradable, and non-abrasive all purpose cleaner." EEOC Mem. at 3 n.1.

enough. The models, they were dirty. The vacant unit was not getting ready for the new tenants."). The warning, which was Lucero's first, indicated that she was advised that "her employment is in jeopardy." Greystar Mot. Ex.17 (D00610).[10]

At the time of the February 3 meeting, Lucero was pregnant with her second child. Ervin Dep. at 11. She gave birth to a healthy child in late August 2009. Lucero Dep. at 91; Declaration of Amada Lucero, Mar. 14, 2013 ("Lucero Decl.") ¶ 12.

Upon receiving the warning on February 3, 2009, Lucero informed Rodriguez and Ervin of her pregnancy. Lucero Dep. at 23; Lucero Decl. ¶ 4.[11] Moreover, Lucero stated that she did not want to work around chemicals until after her pregnancy. Lucero Dep. at 19, 23; Ervin Aff. ¶ 12. As Lucero explained in her Declaration, she was concerned that the chemicals she used with Greystar were stronger than those to which she was exposed while working with CBRE during her previous pregnancy. Lucero Decl. ¶ 6. Lucero proposed working with the complex's other housekeeper, who could work with the cleaning chemicals while Lucero performed other tasks. Lucero Dep. at 52-53; *see also id*. at 16 (Lucero "asked if [she] could do some other type of work"). However, Ervin expressed doubt that such an arrangement was feasible, because Lucero's job required the use of chemicals. Lucero Dep. at 53.[12]

---

[10] Neither party argues that Greystar's subsequent actions regarding Lucero's employment status were connected to the performance concerns discussed on February 3, 2009.

[11] Greystar states that Lucero raised the issue of her pregnancy "immediately after she was disciplined" on February 3, 2009. *See* Greystar Mot. at 7. The EEOC does not dispute that assertion.

[12] During her previous pregnancy, Lucero had also worked as a housekeeper, for another real estate firm, CBRE. She did not request a change in duties during that pregnancy and continued to work with chemicals, such as diluted Simple Green, Windex, Ajax, and ABC Bowl Cleaner. Lucero Decl. ¶ 5. Her first child was also born healthy. *Id.*

In response to Lucero's request for a modification of her duties, Ervin told Lucero to provide a doctor's letter specifying what work she was capable of doing, and gave her a job description that she could share with her physician. Solomon Dep. Ex.A (e-mail from Ervin to Solomon dated February 3, 2009, recounting conversation with Lucero); Lucero Dep. at 53. Immediately after the conversation on February 3, 2009, however, Lucero was transitioned to tasks that did not expose her to chemicals. Lucero Dep. at 58-59. That work initially involved delivering written notifications to apartments in the complex. Lucero Dep. at 75; Ervin Aff. ¶ 14. She was subsequently assigned to work for several weeks on a biannual preventative maintenance project, which required her to accompany a maintenance employee to apartments and to record items in need of repair. Lucero Dep. at 61, 74-75; Ervin Aff. ¶ 14. According to Ervin, neither of these tasks were typical responsibilities for a housekeeper. Ervin Aff. ¶ 14.

On February 6, 2009, Lucero met with her physician and obtained a letter (the "February 6 Letter") setting forth certain medical restrictions for Lucero, which she submitted to Greystar. Lucero Dep. at 54 & Ex.4. The letter, signed by Jacqueline Apgar, M.D., stated that Lucero "should minimize exposure to any chemicals for the remainder of her pregnancy." Lucero Dep. Ex.4.[13] Two HR employees, Matthew Smith and Shawna Solomon, found "very vague" the February 6 Letter's statement that Lucero should "minimize exposure" to "chemicals." Solomon Dep. at 42. Accordingly, Greystar asked Lucero to bring another note from her physician that explained with greater specificity what Lucero was permitted to do. Lucero Dep. at 62.

---

[13] The February 6 Letter also stated that Lucero should not lift more than 25 pounds, but that lifting limitation posed no problem to Greystar. Solomon Dep. Ex.C (D00701); Lucero Dep. at 59; Ervin Aff. ¶ 18.

Around the time that Lucero obtained the first doctor's note, Lucero began to modify her original request to avoid exposure to cleaning chemicals, by expressing a willingness to resume at least some of her prior responsibilities. *See* Ervin Dep. at 13. According to Ervin, at the time Lucero provided the February 6 Letter, Lucero indicated that she was willing to vacuum and to perform "[l]imited cleaning based on the chemical" exposure, which included cleaning refrigerators, pantries, and floors. Ervin Dep. at 51, 56 & Ex.I (D00697) (e-mail from Ervin to Solomon and Aaron dated February 6, 2009). However, as Ervin further noted, Lucero wanted to avoid cleaning showers and bathrooms, ovens, and light fixtures, as well as any work requiring a ladder. Ervin Dep. Ex.I (D00697).

At her deposition, Lucero testified that she remained willing to receive shipments and packages, to clean the gyms, check the trash, tend to plants, and clean model apartments. Lucero Dep. at 14. But, performing those tasks required Lucero to use cleaning chemicals, which according to Greystar included 409, Zep cleaner, bleach, and Windex. Ervin Dep. at 53; Solomon Dep. at 40; Aaron Dep. at 49-50; Lucero Dep. at 15; *see also* EEOC Mem. at 4 (acknowledging that those tasks required cleaning products, including bleach). As Lucero explained in her Declaration of March 14, 2013, she was unwilling to work with oven cleaner and undiluted Simple Green, as she believed that they were stronger than the products she used while employed at CBRE during her first pregnancy. Lucero Decl. ¶ 6.

Despite Lucero's willingness to work with certain cleaning products, Ervin remained "uncomfortable having her do anything that [was] within the confines of the letter" from Lucero's physician. Ervin Dep. Ex.I (D00696) (e-mail from Ervin to Solomon and Aaron dated February 10, 2009). Based on the restriction in the February 6 Letter, stating that Lucero

"should minimize exposure to any chemicals for the remainder of her pregnancy," Lucero Dep. Ex.4, Ervin was unwilling to allow Lucero to perform work that involved any product or chemical other than water. *See* Ervin Dep. at 57-59. Accordingly, Ervin did not permit Lucero to clean refrigerators, pantries, and floors, Ervin Dep. at 53-54, or to otherwise work with cleaning products. *Id.* at 57-58 & Ex.I.

Lucero met again with her physician on February 17, 2009. Lucero Decl. ¶ 9. She obtained a second letter, dated that day (the "February 17 Letter"), which stated, in part, Lucero Dep. Ex.5 (D00457) (capitalizations in original):

> Amada Lucero is an obstetrical patient under our care. Her EDC is 9/3/09.
>
> Due to her pregnancy I have advised the following restrictions for the remainder of her pregnancy:
>
> > 1. No lifting, carrying, pushing or pulling anything over 25lbs 100% of the time.
> > 2. Exposure to chemicals/cleaning supplies or pre-mixing MUST be kept to a minimum (10% or less total time) – must work in well ventilated area and wear mask when chemicals/cleaning supplies present
> > 3. NEVER climb ladders . . . .

Lucero subsequently gave this letter to Ervin. Lucero Dep. at 67.[14]

In Ervin's view, the February 17 Letter confirmed that, if Lucero were to comply with her physician's restrictions, Lucero could not perform her job. As Lucero explained, "[Ervin] told me that most of the jobs there involve working with chemicals all the time, so how could I

---

[14] The typed signature line of the February 17 Letter contains the name of the same physician—Jacqueline Apgar, M.D.—as the other two doctor's letters that Lucero submitted to Greystar. But, unlike the others, this letter is actually signed by Cynthia King, M.D., on behalf of Dr. Apgar. *See id.* Further, although the February 17 Letter was otherwise typed, the portion reading "must work in well ventilated area and wear mask when chemicals/cleaning supplies present" was added in handwriting and initialed. *See* Lucero Dep. Ex.5 (D00457). Neither party attaches any significance to either of those aspects of the February 17 Letter.

possibly work 10 percent with chemicals." Lucero Dep. at 67; *see id*. at 68 (Ervin wondered "how would this work, too much of [Lucero's] job involves chemicals"). Notably, Ervin said she could not eliminate from Lucero's tasks the cleaning of vacant apartments, which required the use of cleaning chemicals. Lucero Dep. at 18. Ervin estimated that, at each apartment location, Lucero would have to spend more than 75 percent of her time working with chemicals. Greystar Mot. Ex.21 (000831) (e-mail of March 11, 2009, from Ervin to Solomon).

Ervin discussed the February 17 Letter with her supervisor, Senior Regional Property Manager Melanie Aaron, as well as with Shawna Solomon in Human Resources. Ervin Aff. ¶ 19. They agreed that it was impossible to eliminate the use of chemicals from Lucero's position as a housekeeper. *Id*. Because housekeepers were required to work with cleaning chemicals for more of their day than the 10 percent limit allowed by Lucero's physician, Greystar concluded it could not retain Lucero in her housekeeping role. Aaron Dep. at 80.

The parties' accounts diverge on the extent to which Lucero subsequently sought to waive her request for an accommodation and her physician's restrictions. In her post-deposition Declaration, Lucero stated that, shortly after meeting with her physician on February 17, 2009, she told her supervisor, Rodriguez, that she "was willing to work with all of the cleaning products at Greystar so long as I could wear a mask and gloves." Lucero Decl. ¶ 10.[15] The EEOC also cites to several statements in which, it says, Ervin admitted that Lucero sought to

---

[15] Neither party points to any deposition testimony from Rodriguez on this point. Notably, working with a mask and gloves was not addressed in the medical notes furnished to Greystar. As explained, *infra*, when Solomon contacted the office of Lucero's physician to determine whether the physician would sign off on Lucero working with a mask and gloves, the physician declined to do so. *See* Ervin Aff. Ex.M (D00746) (e-mail from doctor's assistant to Solomon dated April 1, 2009, in which assistant explains that the physician "is not going to address this issue any longer" and "will not be signing off on anything else").

waive her medical restriction in its entirety. *See* EEOC Mem. at 6 (citing Ervin Dep. Ex.A (D00563) (e-mail from Ervin to Solomon dated March 3, 2009, explaining that Lucero "is frustrated because she now wants to take back her whole initial complaint") and Ervin Dep. at 13 (stating that Lucero "did want to take back the doctor's note that had already been given to us" and affirming that Lucero "wanted to go back to her regular responsibilities")).

According to Greystar, several of Lucero's statements demonstrate only a limited willingness to resume her prior duties. Greystar Mot. at 10-11. For one, Greystar points to a purported admission by Lucero that she agreed with her physician's restriction and wanted to abide by the limitations. Lucero Dep. at 66 (Lucero agreed that she "was willing to work according to what [the medical restrictions] indicated") and 70 (Lucero agreed with statement that she "want[ed] to follow [her] doctor's advice to make sure that [she] and [her] child were safe"). Greystar also cites an unsigned letter dated February 19, 2009, which Lucero prepared with the help of a coworker, outlining the cleaning products with which Lucero was and was not willing to work. Lucero Dep. at 72; Greystar Mot. Ex.20 (EEOC000027). The letter, addressed "To Whom it May Concern," Greystar Mot. Ex.20 (EEOC000027), stated, in part, *id.*:

> Amada Lucero may perform all job-related duties with the exception of the following chemicals:
> > Clorox
> > Degreaser 409
> > General Purpose Simple Green
> > Easy Off (kitchen cleaner)
> > Murphy Oil Soap
> > Hungry Helpers – Stain and Odor Eaters
> > Spray Nine
> > Climb big ladders
>
> She may use chemicals diluted with water. These include:
> > Windex or any glass window cleaner
> > Pledge furniture polish

Comet powder cleanser
Pine Sol
Scrubbing Bubbles – bathroom cleaner

She is able to clean clubhouses, run vacuums, dust, pull trash, and clean the fitness centers. Touch cleans and cleaning the models is okay as well.

In response, *see* EEOC Reply at 4-5, the EEOC notes that Lucero never gave this letter to her doctor, apparently because the doctor had already written the second letter, dated February 17, 2009. *See* Lucero Dep. at 71.

Greystar also points to Ervin's Affidavit of April 19, 2013. *See* Greystar Reply at 14. There, she averred that although Lucero "was frustrated by her inability to work and wished she had never provided the doctor's notes, [Lucero] never stated that she wanted to begin working with all cleaning chemicals, nor did she state that she wanted to disregard her doctor's recommendations." Ervin Aff. ¶ 25.

In any event, Greystar refused to allow Lucero to perform work that contradicted her physician's instructions, as set forth in the letters it had received. *See* Lucero Decl. ¶ 11. Accordingly, it would not permit Lucero to resume her prior responsibilities without clearance from her physician. Aaron Dep. at 60; Ervin Dep. at 15 ("I explained to [Lucero] that if her restrictions were going to change then she needed to have a doctor's note changing the restrictions that the doctor had already given her."). In other words, Greystar would not allow Lucero to waive her pregnancy-related medical restriction without her doctor's approval, and, in light of the prior medical letters, it required her to provide an additional medical letter that cleared her to resume her prior duties. *See* Ervin Dep. at 14-16.

On February 23, 2009, Greystar decided to place Lucero on "unpaid personal leave" once the preventative maintenance work was completed and to then fill her position. Smith Dep. at

25-26 & Ex.C (D00701) (e-mail dated February 23, 2009, from Ervin to Aaron). Smith, Aaron, and Ervin made that decision jointly, in consultation with Solomon. Smith Dep. at 26. However, Greystar also sought the advice of outside legal counsel before placing Lucero on leave. *See* Deposition of Heather Hepler, Jan. 29, 2013, at 17-18.[16]

On or about February 23, Ervin informed Lucero that because Greystar could not accommodate the restriction concerning her exposure to chemicals, she would be placed on unpaid personal leave after the preventative maintenance project was completed. Ervin Aff. ¶ 19. The only way Lucero could continue working, Ervin indicated, was to obtain another letter from her physician modifying her restrictions. *Id.* As Lucero acknowledged, Ervin and Rodriguez told Lucero that she could continue working if her physician cleared her to perform her job; otherwise, she would not be allowed to continue working at Greystar. Lucero Dep. at 76, 82.[17]

### B. Lucero's Leave of Absence

Ervin and Rodriguez met with Lucero on March 9, 2009, and explained that Greystar could not continue to accommodate her medical restriction. Ervin Aff. ¶ 23. According to Ervin, they told Lucero that she would be placed on an unpaid leave of absence until her physician cleared her to return.[18] *Id.* During that meeting, Ervin explained to Lucero that

---

[16] Although neither the briefing nor the excerpt from Hepler's deposition identifies Hepler's position, she testified that she spoke with outside counsel regarding Lucero's situation. *See id.*

[17] There is no dispute that, because Lucero had worked with Greystar for less than 12 months, she was not entitled to leave pursuant to the Family and Medical Leave Act. *See* Greystar Mot. at 12 n.6.

[18] Although the EEOC maintains that Greystar terminated Lucero, *see, e.g.*, EEOC Mem. at 9, it further argues that "[w]hether Lucero was placed on unpaid leave or permanently

Greystar was not terminating her and instead was placing her on leave. *Id.* ¶ 24. She added that Lucero could reapply to work with Greystar once she was able to resume working with cleaning chemicals, either following her pregnancy or after her physician cleared her to do so. *Id.*; Solomon Dep. at 53-54.

Lucero's last day of work was March 9, 2009. Ervin Dep. at 27. Subsequently, Solomon sent a letter to Lucero dated March 17, 2009, confirming her leave of absence. Greystar Mot. Ex.23 (letter from Solomon to Lucero, stating, *inter alia*, that Lucero was beginning medical leave due to "[a] serious health condition that makes you unable to perform the essential functions of your job"); *see* Lucero Dep. at 29.

On March 10, 2009, Greystar received a third letter (the "March 10 Letter") from Lucero's physician, dated that day. Ervin Aff. ¶ 25. It stated, in part, Greystar Mot. Ex.7 (D00458) (emphasis in original):

> Please be advised that Ms. Lucero may continue to work as a housekeeper 8 hours per day provided she does not lift anything over 20 lbs. and wears a mask and gloves when handling chemicals. It is recommended that exposure to the chemicals be kept to approximately 10% of her total time at *each* site throughout the day.

At her deposition, Lucero acknowledged that the March 10 Letter did not provide any information beyond what had already been conveyed to Greystar. As she further conceded, the March 10 Letter reiterated the 10 percent limit on chemical exposure. Lucero Dep. at 78.

Nevertheless, Greystar's efforts to analyze Lucero's tasks and communicate with her physician about the scope of her medical restriction continued after Lucero's leave of absence

---

terminated does not affect the question of liability." *See* EEOC Mem. at 15; *see also id.* at 16. Accordingly, I refer here only to the unpaid leave of absence, and do not address the issue of termination.

had begun.  The purpose, according to Solomon, was "to help [Lucero] keep working as our housekeeper."  Solomon Dep. at 45.  As Ervin explained, Solomon "wanted to know exactly what our housekeepers' schedules were throughout the day," as part of an ongoing effort "to get a release from [Lucero's] doctor so she could work."  Ervin Dep. at 37.  In this regard, on or around March 13, 2009, Ervin and Aaron worked with Rodriguez, Lucero's direct supervisor, to prepare a task schedule detailing Lucero's responsibilities over a two-day period.  Greystar Mot. Ex.4 (D00703, titled "Daily Tasks – Housekeepers Day 1," and D00704-05, titled "Daily Tasks – Housekeepers Day 2"); *see* Ervin Dep. at 36; Aaron Dep. at 35.  They determined, however, that Lucero's work required exposure to chemicals for the vast majority of her day.  Ervin Aff. ¶ 32.  Aaron and Ervin thus concluded that "Greystar could not accommodate a request to work with chemicals only 10% of the time."  *Id.*

Additionally, after Greystar received the March 10 Letter, Greystar contacted the office of Lucero's physician, in an attempt to explore whether the physician would approve Ms. Lucero's work with cleaning products.  Ervin Aff. ¶¶ 33-34.  On March 24, 2009, Solomon sent the physician's office a list of 17 cleaning products commonly used by the housekeepers.  *Id.* ¶¶ 33-34 & Ex.M (D00748-49) (e-mail from Solomon to doctor's assistant).  When the doctor's assistant responded that she did not recognize some of the products, Solomon provided her with a detailed description of those products.  *Id.* ¶ 34 & Ex.M (D00747-48) (e-mails between Solomon and doctor's assistant).  However, the physician did not change Lucero's medical restrictions.  As the doctor's assistant stated in an e-mail to Solomon dated March 30, 2009, the physician would "not sign off on any of the cleaning agents on the list because she cannot say with any degree of certainty how or if they will adversely affect the baby."  *Id.* Ex.M (D00746)

(e-mail of March 30, 2009, from doctor's assistant to Solomon). In an e-mail response dated March 30, 2009, Solomon inquired further whether the physician "will sign off on allowing Amada [Lucero] to clean with cleaning supplies as long as she is wearing a mask and gloves?" *Id.* (e-mail from Solomon to doctor's assistant). According to the e-mail response from her assistant, the physician responded that she "is not going to address this issue any longer" and "will not be signing off on anything else." *Id.* (e-mail from doctor's assistant to Solomon dated April 1, 2009).

In April or May 2009, Lucero contacted Rodriguez to discuss returning to work after having her baby, and Rodriguez told her that she would need to reapply for her position. Lucero Dep. at 92-93. Nevertheless, Greystar continued to provide Lucero with health and dental benefits, paying both the employer and employee contributions through June 2009. According to Greystar, it discontinued those benefits only after Lucero failed to respond to a letter regarding a new benefits plan. *See* Greystar Mot. at 15-16.

Another housekeeper was hired four or five months after Lucero's departure. Aaron Dep. at 70; Rodriguez Dep. at 111-12. Greystar did not call Lucero back to work; in Ervin's view, it was Lucero's responsibility to contact them about returning, Ervin Dep. at 29, and she failed to do so following her pregnancy. Lucero Dep. at 91.[19]

---

[19] Lori Vickory, Employee Relations and Performance Manager at Greystar, sent three letters to Lucero in early 2010. Greystar Mot. Ex.10-12. The first, dated January 21, 2010, stated: "It recently came to Greystar's attention that you may be eligible for medical leave under the Family and Medical Leave Act." Greystar Mot. Ex.10 (D00618). Greystar enclosed a Certification of Health Care Provider form that it asked Lucero to submit by February 12, 2010. *Id.* A subsequent letter, dated February 18, 2010, extended the reply deadline until March 2, 2010, and indicated that if Lucero did not respond by then, Greystar would assume that she voluntarily resigned her position. Greystar Mot. Ex.11 (D00617). A final letter, dated March

<u>C.  Greystar's Employment Practices</u>

Greystar has no policy prohibiting women from working while pregnant, nor does it require pregnant employees to supply a medical note as a condition of continued employment. Affidavit of Lori Vickory, Employee Relations and Performance Manager at Greystar, Apr. 19, 2013 ("Vickory Aff.") ¶ 17; Ervin Aff. ¶¶ 43-44.  Indeed, other Greystar employees who lacked medical restrictions, including housekeepers, continued to work during their pregnancies. Vickory Aff. ¶¶ 17, 25.  Both Ervin and Elida Guerra, the employee who replaced Lucero as a housekeeper, were among the seven Maryland-based employees of Greystar who continued working while pregnant.[20]  Vickory Aff. ¶¶ 18-20; Ervin Aff. ¶ 40.

As a general matter, Greystar only requests medical authorizations from employees who face medical issues that prevent them from completing essential job functions.  Vickory Aff. ¶ 27.  Greystar maintains that it "does not regularly request notes from pregnant employees unless and until they notif[y] the Company of a medical restriction prevent[s] them from performing the essential functions of their job."  *Id.* ¶ 24.

Further, Greystar required both male and non-pregnant female employees to submit doctor's notes where the employees were unable, due to illness or injury, to perform their jobs. Vickory Aff. ¶ 21; Ervin Aff. ¶ 44.  One such employee was a male Service Supervisor who told Greystar that his physician had advised him to stop working around paint and chemical fumes.

---

15, 2010, noted the lack of response and confirmed that Greystar would assume that Lucero voluntarily resigned.  Greystar Mot. Ex.12 (D00616).

[20] Guerra continued working until her physician placed her on bed rest during her third trimester.  Ervin Aff. ¶ 40.

Vickory Aff. ¶ 22.  After receiving several medical notes from the employee, Greystar informed

him that it could no longer accommodate his restriction and placed him on leave.  *Id.*

Additional facts are included in the Discussion.

## Discussion

### A.  Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  It

provides, in part:  "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  A fact is

"material" if it "might affect the outcome of the suit under the governing law."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'"

establishing a triable issue.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th

Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *accord*

*Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  In other words, the non-moving party

must show disputes of material fact so as to preclude the award of summary judgment as a matter

of law.  *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986).  "By its

very terms, this standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Liberty Lobby*, 477

U. S. at 247-48 (emphasis in original).

In resolving a summary judgment motion, the court may not make credibility determinations. *Black & Decker Corp. v. United States*, 436 F. 3d 431, 442 (4th Cir. 2006). Moreover, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587; *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there exists a dispute of material fact that precludes summary judgment. *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court is not required to grant summary judgment. Rather, it must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller, & Kane, *Federal Practice & Procedure* § 2720, at 336-37 (3d ed. 1998, 2012 Supp.); *see ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983), *cert. denied*, 469 U.S. 1215 (1985).

### B. Title VII and the PDA

Title VII provides: "It shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual . . . because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 701(k) of Title VII contains the Pregnancy Discrimination Act, enacted by Congress in 1978. The PDA amended Title VII's definition of sex discrimination so as to include employment discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions[.]" 42 U.S.C. § 2000e(k). The PDA provides that "women affected by pregnancy . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

The Supreme Court has said that the PDA "makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions." *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983). Nevertheless, the statute "'does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees.'" *Young v. United Parcel Service, Inc.*, 707 F.3d 437, 448 (4th Cir. 2013) (quoting *Armstrong v. Flowers Hosp.*, 33 F.3d 1308, 1317 (11th Cir. 1994)). Indeed, "'[e]mployers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees[.]'" *Young*, 707 F.3d at 447 (quoting *Troupe v. May Dep't. Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994)). Thus, "where a policy treats pregnant workers and nonpregnant workers alike, the employer has complied with the PDA." *Young*, 707 F.3d at 449.

"'A claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII.'" *Id.* at 445-46 (citations omitted). *See Jordan v. Radiology Imaging Assocs.*, 577 F. Supp. 2d 771, 779 (D. Md. 2008). In a suit claiming pregnancy discrimination, the plaintiff "bears the ultimate burden of establishing that the defendant discriminated against her 'because of' her pregnancy."

*DeJarnette v. Corning*, 133 F.3d 293, 297 (4th Cir. 1998) (citing 42 U.S.C. §§ 2000e-2(a)(1) -

(2)); *accord Glunt v. GES Exposition Services, Inc.*, 123 F. Supp. 2d 847, 864 (D. Md. 2000)

(quoting *DeJarnette*, 133 F.3d at 297).

There are "two avenues" by which a plaintiff may prove that an adverse employment

action amounts to intentional employment discrimination. *Hill v. Lockheed Martin Logistics*

*Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *cert. denied*, 543 U.S. 1132 (2005).

Although these two methods establish the standards to prove intentional employment

discrimination *at trial*, *see id.* at 284, they inform a court's evaluation of the parties' proffers of

evidence at the summary judgment stage.

The first avenue available to a plaintiff is to offer evidence of discrimination under

"'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996)

(citation omitted). To satisfy ordinary principles of proof at trial, a plaintiff must provide direct

or circumstantial evidence of discrimination that is sufficiently probative to meet the burden of

proof. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

"Direct evidence must be 'evidence of conduct or statements that both reflect directly the

alleged discriminatory attitude and that bear directly on the contested employment decision.'"

*Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (quoting *Taylor v. Virginia*

*Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)) (citation and further quotation marks

omitted). Courts have defined "direct evidence" as that which, if believed, "would prove the

existence of a fact . . . without any inference or presumptions." *Jordan*, 577 F. Supp. 2d at 779

(citation and quotation marks omitted). The second prong amounts to a nexus requirement:

"Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the

adverse employment action." *Warch*, 435 F.3d at 520. In determining whether a nexus exists, courts have considered "the context of the statement, its temporal proximity to the adverse employment action, and the status of the person making the statement[.]" *U.S. E.E.O.C. v. CTI Global Solutions, Inc.*, 815 F. Supp. 2d 897, 906 (D. Md. 2011) ("*CTI Global Solutions*").

"To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original), *cert. denied*, 535 U.S. 933 (2002). "[A] plaintiff faces a demanding standard when attempting to demonstrate direct evidence." *Id.* (citations omitted). *See Diamond v. Colonial Life & Accident Ins.*, 416 F.3d 310, 318 (4th Cir. 2005) (noting that "direct evidence of intentional discrimination is hard to come by") (citation and quotation marks omitted); *CTI Global Solutions*, 815 F. Supp. 2d at 906 ("To defeat a motion for summary judgment, the evidence must show that the employer announced, admitted, or 'otherwise unmistakably indicated' that an impermissible consideration was a determining factor, or that discrimination can properly be assumed from the circumstances.") (citing *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982)).

The second avenue of proof available to a plaintiff at trial is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[21] Under that framework, a plaintiff must first establish a prima facie case that the

_____

[21] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII of the Civil Rights Act of 1964. However, the burden-shifting methodology it endorsed has been

defendant acted with discriminatory intent.  *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998).  "To establish a prima facie case of gender discrimination, a plaintiff must show: '(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action . . . ; and (4) that similarly-situated employees outside the protected class received more favorable treatment.'"  *Gerner v. County of Chesterfield, Va.*, 674 F.3d 264, 266 (4th Cir. 2012) (quoting *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)) (omission in *Gerner*).

If the plaintiff can establish a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to show evidence of a legitimate, non-discriminatory reason for its adverse employment action.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  "If the defendant carries this burden of production," the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason," and that the plaintiff "has been the victim of intentional discrimination."  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981); *see Reeves*, 530 U.S. at 143.

The Fourth Circuit has explained that, "[i]n the event that a plaintiff has direct evidence of discrimination or simply prefers to proceed without the benefit of the burden-shifting framework, she is under no obligation to make out a prima facie case.  Indeed, the *McDonnell*

---

adapted for use in other statutory contexts, including Title VII claims of sex discrimination. *See, e.g.*, *Young*, 707 F.3d at 445-46 (applying *McDonnell Douglas* framework to Title VII sex discrimination claim); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 50-52 & n.3 (2003) (applying *McDonnell Douglas* framework in employment discrimination case under Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (en banc) (applying *McDonnell Douglas* framework to employee's claim of age discrimination).

*Douglas* framework is of little value when direct evidence of discrimination is available."  *Diamond*, 416 F.3d at 318 n.4 (citation omitted).  As discussed, *infra*, the EEOC contends that because it has presented direct evidence of discrimination, Greystar's challenges based on the *McDonnell Douglas* proof scheme are inapplicable.  *See* EEOC Reply at 7, 9.

If a plaintiff presents direct evidence of discrimination, this would defeat an employer's summary judgment motion.  In *CTI Global Solutions*, Chief Judge Chasanow explained:

> Generally, after an employee presents direct evidence of discrimination based on pregnancy, an employer may not then avoid liability by demonstrating that an *additional* motivating factor for the adverse employment action is legitimate and non discriminatory.  *See* 42 U.S.C. § 2000e-2(m) (defining an unlawful employment practice to include those adverse actions with "sex . . . [as] a motivating factor . . . even though other factors also motivated the practice"); *Hill*, 354 F.3d at 284 (explaining that § 2000e-2(m) "eliminate[s] the employer's ability to escape liability in Title VII mixed-motive cases by proving that it would have made the same decision in the absence of the discriminatory motivation").  This rule is inapplicable to the present action, however, because Defendant maintains that the *sole* factor motivating its decision to remove [its employee] from [the relevant project] was her inability to perform the requisite climbing and lifting functions of her position.

815 F. Supp. 2d at 909-910 (emphasis and omissions in *CTI Global Solutions*; citation omitted).

## C.  Summary Judgment Arguments

As the Pregnancy Discrimination Act makes clear, discrimination on the basis of pregnancy constitutes discrimination on the basis of sex.  In seeking summary judgment on the issue of liability, the EEOC argues that it has shown that Greystar violated Title VII's prohibition on sex discrimination.  EEOC Mem. at 7.  According to the EEOC, the record contains direct evidence that Greystar intentionally discriminated against Lucero, in violation of Title VII, when it refused to allow Lucero to waive her medical restriction and resume her prior responsibilities.

*Id.* at 8-10.  Further, the EEOC maintains that Greystar's only potential defense—that Lucero failed to meet a Bona Fide Occupational Qualification ("BFOQ")—has been waived and, in any event, did not justify Greystar's conduct.  *Id.* at 10-12.  In the EEOC's view, Greystar's actions are akin to those that courts have held to be unlawful.  *Id.* at 12-15.

Greystar disputes that the EEOC has shown evidence of discrimination—direct or otherwise.  Greystar Mot. at 21.  It emphasizes that Lucero's work status was altered because she requested an accommodation and submitted doctor's notes containing restrictions that were incompatible with her duties.  *See id.* at 5, 21.  Once Lucero raised the issue of an accommodation to avoid chemical exposure, Greystar says, it was entitled to request that Lucero obtain a doctor's note clarifying her restrictions and to rely on the doctor's notes that she subsequently provided.  *See id.* at 23-30.  Although Greystar endeavored to accommodate Lucero's restrictions, she eventually was placed on a leave of absence because Greystar could no longer do so.  *See id.* at 21.  Greystar maintains that the PDA does not require employers to afford preferential treatment to pregnant employees that it would not provide to other employees, *see id.* at 21-23, and argues that it treated Lucero the same as any other employee with a medical limitation.  *See id.* at 3.

### D.  Preliminary Matters

First, Greystar discusses at length the *McDonnell Douglas* burden-shifting framework. *See, e.g.*, Greystar Mot. at 33-45.  In response, the EEOC asserts that the *McDonnell Douglas* framework is inapplicable here.  EEOC Reply at 9 ("It Is Error to Decide This Matter Under the *McDonnell-Douglas* Burden Shifting Analysis"); *see also id.* at 7 n.4 ("Defendant also invites this Court to err by applying the test set out in *McDonnell Douglas*").  Accordingly, the EEOC

offers no rebuttal to Greystar's arguments concerning the burden-shifting approach. *See id.* at 9-11.

I agree with the EEOC that the *McDonnell Douglas* burden shifting framework does not apply here, because the EEOC has made clear that it is pursuing only a direct evidence theory. The EEOC could have chosen to pursue the *McDonnell Douglas* framework, but it is not required to do so. *See EEOC v. Lockheed Martin Corp.*, 444 F. Supp. 2d 414, 420 n.7 (D. Md. 2006) ("The EEOC has proffered direct evidence of retaliation; therefore, the familiar burden-shifting analysis of *McDonnell Douglas*[,] which permits a plaintiff to establish a rebuttable presumption that an employer's conduct was discriminatory, is inapposite."); *see, e.g., Williams v. G4S Secure Solutions (USA), Inc.*, 2012 WL 1698282, at *16 (D. Md. May 11, 2012) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

Second, there is no dispute that Lucero suffered an "adverse employment action," which is required to establish a Title VII violation. *See, e.g., James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).[22]

_____

[22] In its opening brief, the EEOC anticipated that Greystar would take the position that Lucero was placed on unpaid leave but never terminated, and therefore suffered no adverse employment action. *See* EEOC Mem. at 15-16. However, Greystar conceded in its opening brief that the EEOC will be able to show Lucero experienced an adverse employment action. *See* Greystar Mot. at 33-34. And, it never argued elsewhere that Lucero suffered no adverse employment action.

Third, I need not address the "bona fide occupational qualification" ("BFOQ") defense. The BFOQ is a "narrow" defense permitting an employer to "discriminate on the basis of 'religion, sex, or national origin in those certain instances where religion, sex, or national origin is . . . reasonably necessary to the normal operation of that particular business or enterprise.'" *Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 200-01 (1991) ("*Johnson Controls*") (quoting 42 U.S.C. § 2000e-2(e)(1)).

In its opening brief, the EEOC argued that Greystar waived that defense by failing to raise it in its Answer, and that in any event the defense cannot justify Greystar's conduct here. *See* EEOC Mem. at 10-12. In response, Greystar characterizes the EEOC's discussion of the BFOQ defense as "strange," given that "Greystar does not assert that being pregnant or not being pregnant was a requirement of the Housekeeper position." Greystar Mot. at 21 n.8. Because Greystar has not pursued the BFOQ defense, it is irrelevant to my analysis of the EEOC's claim.

Fourth, I need not address the issue of whether Greystar made sufficient efforts to modify Lucero's job responsibilities in accordance with her medical restrictions. This is because the EEOC has not pursued a claim that Greystar was required to do more to modify Lucero's duties or that Lucero could have performed her job without using any cleaning chemicals.

Greystar explained in its opening brief that Lucero's medical restrictions were incompatible with her duties as a housekeeper. *See* Greystar Mot. at 26-30. Because the housekeepers worked around chemicals for a majority of their time, and for as much as 75 percent of their day, there is little basis to find that Lucero could have continued to work in her position as Housekeeper while adhering to the limitations outlined by her physician. *See, e.g.*, Greystar Mot. Ex.21 (000831) (e-mail from Ervin to Solomon dated March 11, 2009, explaining

that when Lucero is cleaning apartments, "she will be using chemicals which combined make up at[]least 75% of the time in any one location"); Aaron Dep. at 80 (there was no "way to eliminate the use of chemicals and still have Ms. Lucero perform the housekeeping role").

In response, the EEOC stated that "[t]he only issue in this case is whether" Greystar violated Title VII "by refusing to allow Amada Lucero to waive her pregnancy-related medical restriction and resume work." *See* EEOC Reply at 1. Thus, I agree with Greystar that the EEOC has abandoned any argument that Greystar was required to take further steps to accommodate Lucero, such that she could continue working as a housekeeper within the specific boundaries of her medical restriction. *See* Greystar Reply at 1 (citing EEOC Reply at 12, and stating: "EEOC does not claim that Greystar was required to accommodate Ms. Lucero's medical restrictions."); *see also Grant-Fletcher*, 2013 WL 4051890, at *8 (failure to oppose an argument raised in a motion for summary judgment constitutes abandonment).

### E. Title VII/Pregnancy Discrimination Act Violation

The central issue in this case is whether Greystar discriminated against Lucero by adhering to her doctor's notes and refusing to allow Lucero to waive her medical restrictions. *See* EEOC Reply at 1 ("The only issue in this case is whether" Greystar violated the PDA "by refusing to allow Amada Lucero to waive her pregnancy-related medical restriction and resume work."); *see also id.* at 6 ("The operative facts of this case are that Lucero wanted to waive her request but was stopped from doing so out of concern for the fetus."). As noted, the EEOC contends that it has shown direct evidence of discrimination, and therefore summary judgment in its favor is appropriate. Greystar disputes that contention, and insists that the evidence shows that it is entitled to summary judgment.

<u>1. Direct evidence of discrimination</u>

The EEOC posits that Greystar's "approach to its pregnant workers such as Lucero was to focus on protecting the fetus." EEOC Mem. at 4. In support of its contention, the EEOC relies heavily on the deposition testimony of Greystar Human Resources Director Matthew Smith, arguing that his statements constitute direct evidence of discrimination. EEOC Mem. at 4, 6, 8, 9, 10, 13; EEOC Reply at 2-4, 6, 9, 14. Smith's deposition was taken on October 11, 2012, more than three and a half years after the events in issue. *See* Smith Dep. at 1 (reflecting deposition date). By that time, Smith apparently had left Greystar, and he indicated that, before reviewing documents and preparing for his deposition, he had little recollection of the underlying events. *See id.* at 34-35.

It is noteworthy that, in the context of the cross motions for summary judgment, the parties offer sharply different interpretations of Smith's testimony. In the EEOC's view, "Smith's deposition testimony makes clear that he was acting to protect Lucero and her fetus." EEOC Reply at 2; *see also, e.g.*, *id.* at 9 ("Defendant's HR Director Matt Smith, the decision maker, testified that Defendant was trying to protect Lucero's fetus") and 11. In stark contrast, Greystar insists that the EEOC "blatantly mischaracterizes and misstates" Smith's testimony, in a "desperate attempt to convince the Court that Greystar acted unlawfully and actually had a fetal protection policy[.]" Greystar Mot. at 45. *See also* Greystar Reply at 2-3.

The first of two excerpts that the EEOC highlights is an exchange between Smith and counsel for the EEOC, during which Smith testified as follows, Smith Dep. at 30-31:

[EEOC Counsel:] Why would she need to adhere to her physician's restrictions?

[Smith:] Because the physician is the only one who said that she couldn't do the work based on her status as a pregnant woman.

[EEOC Counsel:] But couldn't she make her own choice as to whether or not to follow the physician's advice?

[Smith:] She could, but we had knowledge that the physician had instructed her not to. It's like putting toothpaste back into the tube once you have squeezed it out. We had knowledge that she may be damaging her own health or the health of the child, so . . .

[EEOC Counsel:] So once you have that knowledge that she may be damaging her own health or the health of the child by working, JPI can no longer allow her to work; is that correct?

    [Greystar Counsel:] Objection. Objection. That mischaracterizes what he said.

[Smith:] She can make her own choice. But as a fiduciary of the company, we have a responsibility to adhere to the law. The reason we got the certification from the physician, the doctor's note, was to give us guidance as to what she could and could not do.

The second set of statements occurred after counsel for the EEOC indicated he had no further questions. At that time, counsel for Greystar asked Smith to "briefly tell us what you recall about Ms. Lucero's situation and what your involvement was?" *Id.* at 34. Smith responded as follows, *see id.* at 34-35:

    Like I said earlier, a month ago, I wouldn't have remembered really anything tied to this matter, but after having looked at some of the documentation, what I recall is that Ms. Lucero was disciplined for her poor performance on the job. And in response to that, she initiated a request that she not do certain types of work within her job description because she was pregnant.

    After going through this discussion and looking at the documents, it seems to me that we went to great lengths to try and accommodate this person's ability to do their job and tried to seek counsel from her treating physician so that we would not put her or her unborn child in any kind of danger or injury or birth defect or what have you. And we worked through an extensive iterative process to get there.

    Based on the doctor's prohibition of work, we did not have a position that Ms. Lucero could do any longer after she completed some other tasks that we had

assigned her in an effort to extend her employment, her active employment. When we got to the end of that, we put her on a leave of absence to protect her from the responsibilities that she couldn't do per her doctor's orders.

As indicated, "direct evidence" includes "'conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Warch*, 435 F.3d at 520 (quoting *Taylor*, 193 F.3d at 232) (internal quotation marks omitted). Under the second prong, to determine whether a sufficient "nexus" exists, courts have considered "the context of the statement, its temporal proximity to the adverse employment action, and the status of the person making the statement[.]" *CTI Global Solutions*, 815 F. Supp. 2d at 906.

In early 2009, Smith served as Greystar's Director of Human Resources. Smith, Melanie Aaron, and Joi Ervin jointly decided to place Lucero on a leave of absence. Smith Dep. at 26. Shawna Solomon, who reported to Smith, also played a role regarding Lucero's situation. Solomon Dep. at 26, 38. Given Smith's position and his role with respect to Lucero, the statements in his deposition testimony were not the sort of "stray remarks" that are incapable of qualifying on their own as direct evidence. *See Schafer v. Maryland Dept. of Health and Mental Hygiene*, 359 F. App'x 385, 388 n.2 (4th Cir. 2009) ("[S]tatements related to the hiring decision made by an actual decisionmaker are not 'stray remarks.'"). The comments at issue are neither passing remarks made in the workplace nor generalized statements about pregnant employees; rather, they concern Greystar's actions toward Lucero in particular.

In my view, the first excerpt is ambiguous. Smith's remarks about Lucero's pregnancy came in response to questions posed by the EEOC's lawyer concerning the medical restriction that Lucero presented to Greystar. In the light most favorable to Greystar, it was in that context

that Smith referred to Lucero's underlying pregnancy and "the health of the child." In general, mere references to an employee's pregnancy in the context of discussions about employment status are not automatic grounds for inferring a discriminatory attitude; courts addressing Title VII claims have declined to reflexively interpret such comments as evidence of discrimination. *See Young*, 707 F.3d at 451 ("Martin's statement about UPS's policy providing light duty in three instances—but not for pregnancy—is simply one of fact"). *See also Appel v. Inspire Pharmaceuticals, Inc.*, 428 F. App'x 279, 282 (5th Cir. 2011) (statement from employee's supervisor, indicating that she was fired because he thought she could not perform her job duties due to complications arising from her pregnancy, was not direct evidence of discrimination; rather, "[i]t is actually evidence that she was terminated because she was incapable of performing her job functions because of medical complications specific to her pregnancy"); *Kucharski v. CORT Furniture Rental*, 342 F. App'x 712, 713-14 (2d Cir. 2009) (affirming summary judgment for employer; although supervisor referenced employee's pregnancy in e-mail discussing her termination, employee did not return to work as required under employer's leave policy, which employee conceded "applies uniformly regardless of sex or medical condition").

In the second excerpt, Smith explained that Greystar "tried to seek counsel from her treating physician so that we would not put her or her unborn child in any kind of danger or injury or birth defect or what have you." Smith Dep. at 35. To be sure, the pregnancy-related remarks were linked to Greystar's effort to obtain information from Lucero's physician, which Greystar maintains was part of an appropriate and non-discriminatory response to Lucero's request for an accommodation. Nevertheless, Smith expressly referred to several perceived

dangers that are specific to pregnancy, suggesting that Greystar may have approached Lucero's situation in the manner it did because she was pregnant. Put differently, Smith's statements are consistent with a heightened sensitivity to pregnant women, such that Greystar would have afforded greater deference to a pregnant worker's medical restrictions than to those of its other employees. Moreover, these statements were volunteered by Smith—who, as noted, had reviewed documents in advance of his deposition—as he summarized his own involvement and understanding of how Greystar addressed Lucero's request for an accommodation. *See* Smith Dep. at 34. In my view, the statements are sufficient to enable the EEOC to meet its burden to show "direct evidence" of discrimination.

Beyond Smith's statements, the EEOC discusses several other statements in connection with its claim that Greystar unlawfully refused Lucero's request to waive her medical restriction because of an improper "concern for the fetus." EEOC Reply at 6 (citing Ervin Dep. at 13 & Ex.A (D00563-64)). One such excerpt is the following portion of Ervin's deposition, Ervin Dep. at 13:

> [EEOC Counsel:] When Ms. Lucero became pregnant did she request a change in job duties?
>
> [Ervin:] Yes.
>
> [EEOC Counsel:] And she later requested to waive that change of job duties, correct?
>
> [Ervin:] She did want to take back the doctor's note that had already been given to us for a change in her job responsibilities.
>
> [EEOC Counsel:] So she wanted to go back to her regular responsibilities, correct?
>
> [Ervin:] Yes.

- 34 -

These statements, although relevant to whether Lucero sought to waive her medical restriction, contain no suggestion that Greystar treated Lucero in a discriminatory manner.

The EEOC also points to an e-mail to Solomon dated March 3, 2009, in which Ervin stated, *inter alia*, that Lucero "is frustrated because she now wants to take back her whole initial complaint. I told her that she can't do that. Greystar [cannot] waive the health concerns [of] an employee even if they want to waive them." *See* Ervin Dep. Ex.A (D00563-64). But, neither Ervin nor Solomon referred to Lucero's pregnancy or to concerns about fetal health. Rather, the Greystar employees discussed Lucero's medical restriction in generic terms. *See id.*

Nevertheless, based on Smith's deposition testimony, the EEOC has succeeded in showing statements that constitute "direct evidence" of discrimination, thus creating "a genuine issue of material fact as to whether an impermissible factor . . . motivated the employer's adverse employment decision." *See Diamond*, 416 F.3d at 318. Accordingly, in the context of Greystar's summary judgment motion, in which the facts are construed in the light most favorable to the EEOC, the EEOC has presented evidence sufficient to defeat Greystar's motion.

Although the EEOC has shown direct evidence of discrimination, that finding does not end this Court's analysis. As noted, where a plaintiff has shown direct evidence of discrimination, an employer is entitled to present evidence establishing a legitimate, non-discriminatory reason for the adverse employment action. *CTI Global Solutions*, 815 F. Supp. 2d at 909-910.

<u>2. Medical restriction as non-discriminatory basis for employment decision</u>

<u>a. Deference to doctor's notes</u>

Greystar contends that the evidence demonstrates that Lucero was placed on leave not because of her pregnancy, but only because her medical restriction made her unable to perform her job responsibilities as a housekeeper. Moreover, Greystar vigorously argues that it was entitled to rely on the doctor's notes that Lucero presented. *See, e.g.*, Greystar Mot. at 36 & n.10; Greystar Reply at 5-9. In its view, the EEOC seeks to confer "***favored status***" to pregnant employees, by allowing them "to work in violation of the very same doctors' restrictions which the pregnant employees have previously submitted to their employers," when no other Greystar employee is permitted to do so. Greystar Reply at 1-2 (emphasis in original).

The EEOC disagrees. It takes the position that Greystar may not "bootstrap these [doctor's] notes into an argument that Lucero could not do her job" without also arguing, impermissibly, "that maternal and fetal safety are the essence of her job[.]" EEOC Mem. at 13.

Considerable authority exists indicating that an employer may defer to a medical restriction that a physician imposes on an employee. *Young v. United Parcel Service, Inc.*, 707 F.3d 437 (4th Cir. 2013), is instructive. In *Young*, the plaintiff—a delivery truck driver—sued her employer, UPS, after the employer refused to let her work while pregnant and under a medical restriction that limited the amount of weight she could lift. *See id.* at 440-41. Among the essential functions for all UPS drivers is the ability to lift packages weighing up to 70 pounds, *id.* at 439, but two healthcare providers had advised that the plaintiff lift no more than 20 pounds while pregnant. *Id.* at 440. The plaintiff argued, *inter alia*, that the 70-pound limit was illusory, as she could request assistance from others or use a hand truck in the rare instances she

encountered a large package. *Id.* She was willing to perform light duty or other alternate work, which under UPS policies was available for employees injured on the job, disabled under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), or who had lost governmental certification—but not to pregnant workers. *See id.* at 439-41.

Regarding plaintiff's PDA claim under Title VII, the Fourth Circuit affirmed the district court's grant of summary judgment in favor of UPS. *See id.* at 451. Providing accommodation to certain categories of workers but not to pregnant women, the Court said, was not indicative of "discriminatory animus toward pregnant workers." *Id.* at 446. Nor could the plaintiff prevail under the *McDonnell Douglas* burden-shifting framework. *See id.* at 449-51. In so concluding, the Court found that several factors identified by the plaintiff did not evidence unlawful discrimination. *Id.* at 450. Those factors included UPS's request for a doctor's note from the plaintiff identifying her restrictions; there was no suggestion that such requests were made only to pregnant employees and not to others returning from leave, nor did the record indicate that UPS made the request "*because* Young was pregnant." *Id.* at 450-51.

More generally, "[i]t is well-established that a pregnant employee's inability to perform required job functions may justify an employer's lawful decision to take adverse employment action against the employee." *CTI Global Solutions*, 815 F. Supp. 2d at 909. As a result, "only where the employer accommodates—or refuses to accommodate—its pregnant employees in a discriminatory manner will courts conclude that employment discrimination may have occurred." *Id.* at 910 (citing 42 U.S.C. § 2000e(k)). Moreover, courts are reluctant to interfere with an employer's business decisions so long as they are not shown to be discriminatory. *See Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) ("Duty-bound though we

are to examine employment decisions for unlawful discrimination, we are not cloaked with the authority to strip employers of their basic business responsibilities."); *see also Riley v. Technical and Management Services Corp., Inc.*, 872 F. Supp. 1454, 1462 (D. Md. 1995) ("Congress did not intend for courts to use Title VII to second-guess these types of business and personnel decisions.").

For example, in *Daugherty v. Genesis Health Ventures of Salisbury, Inc.*, 316 F. Supp. 2d 262 (D. Md. 2004) (Davis, J.), the court granted an employer's summary judgment motion as to a Title VII claim, where the plaintiff was terminated while pregnant "based on restrictions imposed by her doctor on the performance of her job duties." *Id.* at 263. The employer provided "light duty" assignments to employees injured on the job but, the court concluded, was not required to extend that option to pregnant employees, who were treated no differently than other employees who did not suffer from an on-the-job disability. *See id.* at 263-65. That is because Title VII contains no requirement that an employer "treat disability arising from pregnancy *more favorably* than it treats other forms of temporary disability." *Id.* at 265 (emphasis in original).

b. Withdrawal of the accommodation request

According to the EEOC, although Lucero presented Greystar with several doctor's notes, she nevertheless was entitled to withdraw those notes and to choose to continue to work. *See, e.g.*, EEOC Mem. at 2, 12-15; EEOC Reply at 1, 6-9. In support of its claim, the EEOC cites a number of cases, including *Johnson Controls, Inc.*, 499 U.S. 187, which it says stand for the proposition that "the choice to work while pregnant belongs to the mother and not the employer." EEOC Mem. at 2. Greystar counters: "The only assertion by the EEOC is that an employer ***must*** disregard medical notes submitted by a pregnant employee and permit that employee to work

even where the medical certification concludes the employee is medically incapable of performing the job." Greystar Reply at 1 (emphasis in original) *see also id.* at 6 ("It is absurd for the EEOC to argue that employers should be required to allow pregnant women to work in violation of their doctor's express instructions . . . while no other employees are permitted to do so."). It adds: "The EEOC does not cite even one case to support this notion for expanding the law in such a reckless manner." Greystar Reply at 1.

As an initial matter, the parties disagree about the extent to which Lucero actually wanted to waive the doctor's notes and resume all of her duties. Greystar asserts that Lucero never indicated that she wished to waive her medical restriction in its entirety. In this regard, it maintains that, because of inconsistencies between Lucero's deposition testimony of August 23, 2012, and her Declaration of March 14, 2013, the purported "sham" Declaration must be ignored. *See* Greystar Mot. at 36-37, 47-50.

According to Greystar, Lucero admitted at her deposition that she agreed with her physician's limitations and wanted to adhere to them. Greystar Mot. at 10 (citing Lucero Dep. at 66, 70). Greystar also cites an unsigned letter, prepared by Lucero and dated February 19, 2009 (the "February 19 Letter"), which indicates that she remained unwilling to work with seven chemicals, and would work with five others only if diluted with water. Greystar Mot. Ex.20 (EEOC000027) (February 19 Letter); *see* Lucero Dep. at 72. In its view, those admissions are at odds found in Lucero's Declaration, authored three years after the relevant events, in which she stated that she was willing to work "without any restriction" and "with all of the cleaning products at Greystar as long as I could wear a mask and gloves." *See* Lucero Decl. ¶¶ 10-11.

The EEOC disputes Greystar's position, arguing that Greystar understood Lucero to be seeking to waive her medical restriction in full. *See* EEOC Reply at 1-2, 4-6. Further, it denies any inconsistency between Lucero's deposition testimony and her Declaration, and claims that the evidence demonstrates Lucero wished to waive all work limitations. *See* EEOC Reply at 1-2, 4-6. In this regard, it points out that Lucero never gave her physician the February 19 Letter, *see* EEOC Reply at 4-5 (citing Lucero Dep. at 70-71), and it cites several statements made by Ervin, indicating that she believed Lucero was seeking to waive her restrictions in their entirety. *See* EEOC Mem. at 6 (citing Ervin Dep. Ex.A (D00563) (e-mail to Solomon dated March 3, 2009, in which Ervin explained that Lucero "is frustrated because she now wants to take back her whole initial complaint. I told her that she can't do that. Greystar [cannot] waive the health concerns [of] an employee even if they want to waive them.") and Ervin Dep. at 13 (stating that Lucero "did want to take back the doctor's note that had already been given to us" and affirming that Lucero "wanted to go back to her regular responsibilities")).

The Fourth Circuit adopted the "sham affidavit rule" in *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984), reasoning that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Later, in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999), the Supreme Court provided the following formulation of the sham affidavit rule: "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."

To be sure, Lucero's various statements are not free of inconsistency. Nevertheless, the discrepancies do not rise to a level that would compel the Court to disregard the Declaration. As the EEOC notes, *see* EEOC Reply at 4-6, questions posed to Lucero were often vague or imprecise as to timing. And, for at least some time period, Ervin appears to have acted under the assumption that Lucero sought to waive her medical restriction in full. *See* Ervin Dep. at 13; *id.* Ex.A (D00563).

Turning to the substance of the EEOC's argument, *Johnson Controls*, 499 U.S. 187, is central to its case. Johnson Controls, which manufactured batteries, adopted a policy stating that "'women who are pregnant or who are capable of bearing children will not be placed into jobs involving lead exposure or which could expose them to lead[.]'" *Id.* at 192 (quoting policy). This "fetal-protection policy," the Court said, was facially discriminatory, and amounted to unlawful sex discrimination under Title VII. *See id.* at 197-98.

As the Supreme Court explained, by singling out in its policy employees "'capable of bearing children,'" Johnson Controls classified its employees in a manner tantamount to explicit discrimination on the basis of sex. *See id.* at 199 (quoting policy). The Court said: "Despite evidence in the record about the debilitating effect of lead exposure on the male reproductive system, Johnson Controls is concerned only with the harms that may befall the unborn offspring of its female employees." *Id.* at 198; *see also id.* at 197 ("Fertile men, but not fertile women, are given a choice as to whether they wish to risk their reproductive health for a particular job.").

The circumstances of *Johnson Controls*, in which an employer adopted a broad policy, affecting a large proportion of its female workforce, are far afield from those presented here. Greystar had no policy barring pregnant women from working. At most, it had a practice

pertaining to all workers, by which medical notes were requested from employees who were unable to perform their duties for medical reasons. The EEOC has not pointed to any evidence that Greystar permitted any employee to waive a doctor's restrictions. And, as discussed, *infra*, Greystar's approach to its other employees, male and female, strengthens its claim that it did not treat Lucero in a discriminatory manner based on her pregnancy.

Although PDA cases involving attempted waivers of medical restrictions are scarce, an employer's deference to a medical restriction regarding a pregnant employee has been upheld, even where the employee was willing to work in violation of that restriction. In *Noecker v. Reading Hosp.*, 2010 WL 363840 (E.D. Pa. Jan. 27, 2010), the plaintiff, a nurse, told her employer that she was pregnant, and presented her supervisor with a note from a gynecologist stating that she could not lift more than twenty-five pounds. *Id.* at *1. Because that restriction was incompatible with the lifting requirements of her job, the hospital assigned her to assist with a telephone survey, and placed her on a leave of absence after the survey was completed. *Id.* The district court granted summary judgment for the defendant hospital under the PDA. *Id.* at *5-6. In so holding, the court rejected the plaintiff's suggestion that if a patient fell she would be willing to ignore the doctor's restriction, explaining that the hospital "should not be faulted for refusing to allow [the plaintiff] to perform duties which may have required her to go against her doctor's restrictions, even if this would be a rare occurrence." *Id.* at *5 n.6.

Greystar cites a number of ADA cases involving doctors' notes, but the EEOC argues that those cases are irrelevant in the context of a Title VII sex discrimination claim. In particular, the EEOC insists that because the trial court decision in *Young v. United Parcel Service, Inc.*, 2011 WL 3510997 (D. Md. Aug. 9, 2011), *aff'd*, 707 F.3d 437 (4th Cir. 2013),

involved only the ADA and not a Title VII claim, it is inapposite. But, it cites no authority to support that notion. EEOC Reply at 11-12. And, contrary to the EEOC's position, courts have endorsed the application of principles gleaned from various antidiscrimination provisions, including the ADA and Title VII. *See, e.g.*, *Reynolds v. American Nat. Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012) ("courts often look to Title VII—which defines "employer" in essentially the same way as the ADA—for guidance on ADA issues"); *A Helping Hand, LLC v. Baltimore County, MD*, 515 F.3d 356, 362 (4th Cir. 2008) ("[B]ecause the ADA 'echoes and expressly refers to Title VII, and because the two statutes have the same purpose,' courts confronted with ADA claims have also frequently turned to precedent under Title VII.") (citation omitted); *Rhoads*, 257 F.3d at 391 (same). In my view, the reasoning of ADA cases with analogous facts is persuasive with regard to an employer's right to rely on the terms of a doctor's note presented by an employee to support an accommodation request.

The District Court's opinion in *Young*, which focused only on the ADA claim, addressed a circumstance in which an employee (like Lucero) sought to continue working in a manner contrary to her healthcare provider's orders, and to do so without first obtaining clearance that removed the medical restriction. *See* 2011 WL 3510997, at *3. As Chief Judge Chasanow explained, *id.* (emphasis added):

> Young never provided any medical evidence to UPS other than the initial note that included a lifting restriction. She did not obtain a second note from her midwife. She did not seek a medical opinion from any other medical provider that she was free to work. Instead, she attempted to put the onus on UPS to reach out to Young's medical provider, despite the rather clear language of the lifting restriction . . . . *There is no case supporting the notion that an employer must question a medical provider's judgment and independently divine whether an employee is truly able to work. Nor was UPS required to let Young work merely because she insisted she was able to*.

Similarly, in *Wulff v. Sentara Healthcare, Inc.*, 513 F. App'x 267 (4th Cir. 2013) (per curiam), another ADA case, the Court concluded that an employer was permitted to "abide by the restrictions shown on the form" it received from an employee's physician, even where the employee "contest[ed] the accuracy of this form and contend[ed] that it overstated her restrictions." *Id.* at 269 n.2. As the Court explained, the employee "submitted the form to [her employer] without taking any steps to clarify or correct the alleged misstatements," and she could not avoid summary judgment based on her own "'self-serving opinion'" that lacked "'objective corroboration[.]'" *Id.* (citation omitted). Further, the Court rejected the plaintiff's argument that her employer "did not believe that the restrictions noted on [the medical] form were accurate[,]" because her employer was not obligated "to go beyond the form that [plaintiff] herself delivered to her employer." *Id.* at 271.

Other courts have also endorsed the notion that an employer may rely on the restrictions imposed by an employee's physician. *See, e.g.*, *Hohn v. BNSF Ry. Co.*, 707 F.3d 995, 1003 (8th Cir. 2013) (stating that the ADA "'does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden'") (citation omitted); *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 784 (8th Cir. 2006) ("If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability."); *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003) ("[The employer] was entitled to rely and act upon the written advice from [the employee's] physician that unambiguously and permanently restricted her from vacuuming. In this situation, the employee's belief or opinion that she can do the function is simply irrelevant."); *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1311-12

(11th Cir. 1999) (affirming summary judgment for defendant where employee's physician denied her request to remove her medical restriction); *Bell v. Cabela's, Inc.*, 2009 WL 902266, at *2, 4 (N.D. W. Va. Apr. 1, 2009) (granting summary judgment to employer where terminated employee's medical restrictions were inconsistent with requirements of her position); *Uhalik v. Runyon*, Case No. 95-CV-75179, 1997 U.S. Dist. LEXIS 6911, at *16 (E.D. Mich. Mar. 18, 1997) (where employee sought to perform work contrary to his physician's restriction, employer "was perfectly justified in refusing to return plaintiff to . . . work, absent his doctor's approval"). Such cases support Greystar's argument that deferring to the doctor's notes was legitimate and lawful, even in light of Lucero's attempt to waive her medical restriction.

### c. Greystar's policies and treatment of other employees

The parties also disagree as to whether Greystar's treatment of other employees is relevant in assessing its conduct toward Lucero. The EEOC insists that Greystar's employment of other pregnant women, including her successor, is irrelevant under the direct evidence approach on which it relies. EEOC Reply at 11. Greystar contends, however, that the EEOC's lack of evidence that other employees were treated differently is a "fatal flaw" in this case, as in any discrimination case. Greystar Mot. at 4. Greystar's treatment of other employees is arguably relevant to support its claim that Greystar placed Lucero on leave because she could not perform her job, and not based on unlawful discrimination.

As noted, Greystar had no policy that prohibited pregnant women from working. Nor did it require pregnant employees to obtain a medical authorization to work. Vickory Aff. ¶ 17; Ervin Aff. ¶ 44. Accordingly, cases on which the EEOC relies, involving employers with policies affecting pregnant women, are of limited relevance. *See, e.g.*, *E.E.O.C. v. Catholic*

*Healthcare West*, 530 F. Supp. 2d 1096, 1099-1103 (C.D. Cal. 2008) (employer violated PDA by maintaining "*facially discriminatory* policy" stating that "'pregnant personnel shall not partake in any fluoroscopy or portable procedures during her term'" even though, as all parties agreed, radiation exposure would be below allowable limits for pregnant women) (quoting policy); *In re National Airlines, Inc.*, 434 F. Supp. 249, 254 (D. Fla. 1977) (airline policy required all flight attendants to be placed on unpaid maternity leave as soon as they learn they are pregnant); *Singer v. Mahoning Co. Bd. Of Mental Retardation*, 379 F. Supp. 986, 987 (D. Ohio 1974) (employer policy barred pregnant teachers from working after fifth month of pregnancy).

The EEOC also notes that, pursuant to 29 C.F.R. § 1604.10, "[a] written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy, childbirth or related medical conditions is in prima facie violation of title VII." EEOC Mem. at 8. That provision offers the EEOC's argument little traction, given that Greystar had no such policy and the EEOC itself insists that the relevant issue is Greystar's treatment of Lucero as an individual. *See* EEOC Reply at 11.

Assuming the relevance of Greystar's conduct as to other employees, that factor does nothing to support the EEOC's claim of unlawful discrimination. Greystar identifies several other employees who continued to work while pregnant, although apparently none sought to waive any medical restriction. Greystar also points to a male employee whose physician told him to stop working around paint and chemical fumes. Vickory Aff. ¶ 22. After receiving several medical notes from that employee's physician, Greystar informed the employee that it could no longer accommodate his restriction and placed him on leave. *Id.* Although there is no indication this employee sought to waive his medical restriction, Greystar's response

corroborates its assertion that its practice is to adhere to all recommendations of health care providers concerning company employees. *See id.* ¶ 23. Moreover, absent from the record is any indication that Greystar allowed other employees to retract medical restrictions, or that it otherwise treated a similarly-situated employee differently than Lucero.

Put another way, the EEOC's claim of discrimination is not bolstered by evidence that Greystar approached Lucero's medical restriction differently than that of any other, non-pregnant employee. At trial, it must counter Greystar's argument that the EEOC seeks "preferential treatment" for "pregnant employees," so as to permit them "to waive or ignore the doctor's instructions they had previously submitted to their employers," even though "other employees with physician-imposed limitations would not enjoy the same ability to ignore physician restrictions." Greystar Reply at 8.

### d. Greystar's approach to Lucero and proof of discrimination

As for Greystar's approach toward Lucero at the time she was transitioned to unpaid leave, Greystar points to its own "extensive efforts in working with Ms. Lucero and her doctor to keep Ms. Lucero working," which, it asserts, "are clearly not the actions of an employer whose goal was paternalistic fetal protection." Greystar Reply at 3-4. I need not recite those actions in their entirety, as they are recounted above in detail. But, they include efforts to assign Lucero to alternate work, to the extent available; to seek both clarifications and clearance from Lucero's physician, both before and after Lucero was placed on leave; and to analyze Lucero's tasks as a housekeeper to determine whether they could be reconciled with her medical restrictions. *See id.*; Greystar Mot. Ex.4 (two "Daily Tasks – Housekeepers" documents); Ervin Dep. at 36; Aaron Dep. at 35. These efforts, all of which occurred during the period when Lucero requested an

accommodation and was placed on leave, are sufficient to create a dispute of material fact that would readily allow a reasonable jury to conclude that Greystar acted for a non-discriminatory reason when it placed Lucero on leave.

Title VII cases involving medical restrictions in which courts have found against employers are factually distinct from the case at bar. In *Carney v. Martin Luther Home, Inc.*, 824 F.2d 643 (8th Cir. 1987), a PDA case, the plaintiff worked at a residential care facility for individuals with intellectual disabilities. *See id.* at 643-44. After the plaintiff became pregnant, she gave her employer a note from her healthcare provider, which indicated that she should refrain from pushing or lifting without assistance from others for the duration of her pregnancy. *Id.* at 644. The plaintiff's supervisor indicated that the note posed no problem, as other staff could assist with the patient transport tasks that the restriction implicated. *Id.* Indeed, it was undisputed that, despite her condition, plaintiff "could have performed her job successfully." *Id.* at 645. Nevertheless, because of the note, the plaintiff was placed on an unpaid leave of absence for the rest of her pregnancy. *Id.* at 644-45.

The District Court concluded that, at the time the plaintiff was placed on leave, she "could have performed her duties without difficulty," and the defendant did not challenge that fact on appeal. *Id.* at 645. Moreover, at least three other employees who became pregnant and were subject to similar medical restrictions on heavy lifting continued to perform their duties and were not required to take a similar unpaid leave during their pregnancies. *Id.* In other words, the plaintiff in *Carney*, unlike Lucero, was capable of performing her normal responsibilities in a manner consistent with her provider's medical restriction. *See also Leeker v. Gill Studios, Inc.*,

21 F. Supp. 2d 1267, 1271 n.2 (D. Kan. 1998) (distinguishing *Carney* on grounds that "in *Carney*, defendant conceded that plaintiff remained able to perform her job").

Another Title VII case that the EEOC cites, *E.E.O.C. v. Service News Co.*, 898 F.2d 958 (4th Cir. 1990), is different in several important respects. The duties of the employee, Nancy Philips, required her "to lift boxes of magazines weighing in excess of 25 pounds." *Id.* at 960. On October 22, 1985, Phillips left a message for a supervisor, Leslie Heck, explaining that she was pregnant. *Id.* That same day, and before speaking with Phillips, Heck interviewed and hired another employee for Phillips's position. *Id.* When Phillips met with Heck the next day, October 23, he "repeatedly expressed concern about Phillips' pregnancy and the possibility of injury should she continue working," and further "recounted the experiences of two employees who had difficulties in continuing to work in other positions because of their pregnancies." *Id.* For her part, Phillips "informed Heck that her doctor had approved her continued employment," and "expressed her desire to continue working[.]" *Id.* She also "informed Heck that her doctor had approved her continued employment." *Id.* After the meeting, Phillips concluded that she had been discharged, and the district court agreed that Phillips was discharged in violation of Title VII because of her pregnancy. *See id.* at 960-61.

On appeal, Service News argued, *inter alia*, that the trial court erred in failing "to address the defense of business necessity, under which its otherwise discriminatory practice may be justified to protect the health of pregnant women and their unborn fetuses." *Id.* at 962. That defense would have required Service News "to prove that significant risks of harm to Phillips and her unborn child made it necessary to discharge her." *Id.* In concluding that the evidence could not sustain a business necessity defense, the Fourth Circuit explained that the only relevant

evidence was Heck's subjective belief, and that Service News offered no "objective, medical opinion evidence of any qualified expert that a pregnant employee could not safely perform" Phillip's job. *Id.* (footnote omitted). The Court noted that plaintiff's "doctor stated that she was physically able to lift 'up to 25 lbs.,'" adding that he nevertheless "expressed no opinion on the possibility of harm should she lift more than that weight." *See id.* at 963, n.3.

Here, Greystar has not invoked a business necessity defense. Moreover, the EEOC has cited no authority suggesting that an employer must independently confirm or present testimony at trial establishing the validity of a physician's restriction submitted by an employee. Based on the timeline in *Service News*, the supervisor's decision had been made completely independent of any information from Phillips's physician. In contrast, the record here is devoid of evidence, contemporaneous with Lucero's leave of absence, showing that Greystar determined, independent of the advice of Lucero's physician, that the health of Lucero or her fetus required the company's intervention. Nor does plaintiff's rapid dismissal in *Service News* bear any resemblance to Greystar's measured, weeks-long attempt to accommodate Lucero's medical restriction.

Greystar's handling of Lucero's situation lacks factors present in other contexts in which courts have found discriminatory intent. This is not a case in which an employer, despite a physician's approval to return to work, independently or paternalistically determined that a pregnant employee should not work. In *E.E.O.C. v. Ecurie Alford Ltd.*, 1993 WL 389433 (E.D. Va. July 15, 1993), for example, the court found direct evidence of discrimination when the employer terminated a pregnant horse groomer based on concerns about liability related to her pregnancy, even though the employee informed the employer "that her doctor had given his

approval for her to continue working." *Id.* at *1-2.  *See also, e.g.*, *Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 434 (8th Cir. 1998) (affirming jury verdict for plaintiff on PDA claim where, despite her doctor's approval to return to work, she was placed on medical leave by supervisors who were "acting on an assumption that she had a pregnancy-related complication that would not allow her to perform her job functions"); *E.E.O.C. v. Catholic Healthcare West*, 530 F. Supp. 2d 1096, 1099-1103 (C.D. Cal. 2008) (employer violated PDA by prohibiting pregnant employees from certain work, despite parties' agreement that radiation exposure would be below allowable limits for pregnant women); *E.E.O.C. v. Corinth, Inc.*, 824 F. Supp. 1302, 1306 (N.D. Ind. 1993) (restaurant owner told pregnant waitress "it would be dangerous for her to continue working because she was 'too big' and 'might fall down'"); *EEOC v. Old Dominion Security Corp.*, 1986 WL 32649, at *1 (E.D. Va. July 16, 1986) (employer violated PDA by telling pregnant security guard not to return to work because of her pregnancy, even though she presented her employer with a physician's medical certificate stating that "'there are *no* contraindications to her full-time employment'" and that she "'is capable of working to her due date'") (quoting medical certificate; emphasis in certificate).

Nor does this case present a situation in which an employer decided on its own initiative to block a pregnant employee from working, without first obtaining a medical opinion.  *See, e.g.*, *Peralta v. Chromium Plating & Polishing Corp.*, 2000 WL 34633645, at *5, *8 (E.D.N.Y. Sept. 15, 2000) (supervisor summoned plaintiff to discuss her pregnancy and, although facts did not clearly indicate plaintiff formally requested accommodation, supervisor told plaintiff she could not work "unless she provided a letter from a doctor stating that her work would not endanger either herself or her fetus"); *E.E.O.C. v. Corinth, Inc.*, 824 F. Supp. at 1306.  To the contrary,

Greystar asked Lucero to provide a doctor's note in response to her request for an accommodation based on her pregnancy. The EEOC does not argue that it was improper for Greystar, in response to Lucero's request for work modifications, to request that she obtain clarification from her physician. And, the record contains no suggestion that Greystar would have barred Lucero from working had she decided not to pursue a doctor's note articulating medical restrictions that implicated a central aspect of the housekeeper's position.

In connection with the EEOC's motion, I must view the facts in the light most favorable to Greystar. They fall far short of warranting summary judgment for the EEOC.

Of course, receiving an accommodation request from a pregnant employee does not provide an employer with license to restrict the employee in a discriminatory manner. Nevertheless, the undisputed facts indicate that Greystar had no policy barring pregnant women from working; it did not initiate any issue of concern as to Lucero's pregnancy; and it requested a doctor's note only after Lucero sought an accommodation. The record also reflects a concerted effort by Greystar to accommodate Lucero pending clarification of her physician's requirements, and to determine whether her medical restrictions could be reconciled with the requirements of her position as a housekeeper. Moreover, according to Greystar, it placed Lucero on unpaid leave only after determining that it could not employ her as a housekeeper while also respecting the medical restrictions that Lucero's own physician had declined to retract. Notwithstanding the remarks of Greystar's Director of Human Resources, there is ample evidence indicating that Lucero was placed on leave for a legitimate, non-discriminatory reason.

**Conclusion**

This case is not appropriate for resolution by way of summary judgment, because there are disputes as to material facts.  Accordingly, I will deny the parties' respective motions for summary judgment as to plaintiff's claim of sex discrimination.  A separate Order follows.


Date:   December 18, 2013                    _____/s/_____
                                            Ellen Lipton Hollander
                                            United States District Judge